STAR MILL & ELEVATOR CO. v. FT. WORTH GRAIN & ELEVATOR CO.

(Court of Civil Appeals of Texas. Texarkana. March 21, 1912. Rehearing Denied April 25, 1912.)

1. MONOPOLIES (§ 17*)—COMBINATIONS PROHIBITED—RESTRAINT OF TRADE—"CONSPIRACY IN RESTRAINT OF TRADE."

Anti-Trust Law (Acts 28th Leg. c. 94) §§ 3, 4, provide that all monopolies and conspiracies in restraint of trade are illegal, and that any of the following acts will constitute a conspiracy in restraint of trade, to wit, where two or more corporations, engaged in buying or selling merchandise or produce, enter into an agreement to refuse to buy from or sell to any other person, etc., any such article. Plaintiff and defendant grain dealers made an agreement whereby plaintiff agreed not to buy grain from the growers thereof or from curbstone brokers or other persons not regularly engaged in the grain business. Held, that the contract was void as contravening the statute.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*

For other definitions, see Words and Phrases, vol. 2, pp. 1454–1461; vol. 8, p. 7613.]

2. MONOPOLIES (§ 21*)—ACTION ON CONTRACT — SUFFICIENCY OF EVIDENCE — TERMS OF CONTRACT.

Evidence, in an action by one grain dealer against another for breach of a contract to sell and deliver oats, held to show that the contract bound plaintiff not to buy grain from the growers or other persons not regularly engaged in the grain business.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 15; Dec. Dig. § 21.*]

3. MONOPOLIES (§ 21*) — ENFORCEMENT OF CONTRACTS.

In view of Anti-Trust Law (Acts 28th Leg. c. 94) §§ 3, 4, providing that an agreement made in violation of the act should be "absolutely void and not enforceable either in law or equity," the buyer could not maintain an action for damages for breach of a contract to sell grain which included provisions in restraint of trade contrary to the act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 15; Dec. Dig. § 21.*]

Appeal from District Court, Tarrant County; Jas. W. Swayne, Judge.

Action by the Ft. Worth Grain & Elevator Company against the Star Mill & Elevator Company. From a judgment for plaintiff, defendant appeals. Reversed, and cause dismissed.

Gustavus, Bowman & Jackson, of Amarillo, and Stephens & Miller, of Ft. Worth, for appellant. Capps, Cantey, Hanger & Short, of Ft. Worth, for appellee.

WILLSON, C. J. [1] Appellant was a corporation under the laws of Texas. It owned and operated grain elevators and mills at Amarillo, Canyon City, Hereford, and other places in the Panhandle of Texas, and engaged in a general grain business, buying oats, wheat, etc., from the growers thereof and others, and storing and selling same. Its principal place of business was in Amarillo. Appellee also was a corporation under the laws of Texas. It carried on a general grain business in Ft. Worth. On the ground that appellant had breached its contract to sell and deliver to it certain oats, appellee sued and recovered against appellant a judgment for $3,382.50 as its damages. The principal contention made by appellant in the court below, and the only one made here which we regard as presenting a reason why the judgment should not be affirmed, was that the contract covering the sale of the oats was in violation of the statute known as the "anti-trust law," and therefore void. The particular portions of the statute referred to applicable to the case made by the testimony are as follows: "Any and all trusts, monopolies and conspiracies in restraint of trade as herein defined, are hereby prohibited and declared to be illegal." "Either or any of the

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

following acts shall constitute a conspiracy in restraint of trade: (1) Where any two or more persons, firms, corporations or associations of persons who are engaged in buying or selling any article of merchandise, produce or any commodity, enter into an agreement or understanding to refuse to buy from or sell to any other person, firm, corporation, or association of persons any article of merchandise, produce or commodity." Act 1903, §§ 3, 4; General Laws, p. 119.

[2] It appeared from testimony relevant to the contention specified that the appellee company sent its treasurer or secretary, one Keith, to the section of the Panhandle where the appellant company was engaged in buying grain for the purpose of "looking over the situation to see if it would be advisable to put a man there to buy grain." Keith while looking over the situation endeavored to buy grain, but could not, he said, because there was none to sell. He then called on Dowing, president of the appellant company, at Amarillo, and offered to buy oats of appellant. Dowing testified: "I told him that we would not sell them any oats at any price, and he desired my reason for discriminating in refusing to sell oats to them, and I told him we objected to their methods of doing business, the fact that they were buying of brokers who had no equipment or property rights or investments, who were scoop shoveling at stations where we had large investments, and were causing us to operate our stations without profit, and the further reason that he was bidding to the farmers the price he offered to pay me, which would make it impossible for me to sell him oats and then buy them in that territory and sell them to him at a profit; that, because of the methods that he had pursued in the time, the 10 days or two weeks, immediately preceding that, they had compelled us to handle a great many oats and wheat without profit, in order to protect our territory. For that reason I did not want to do any business with them. * * * They had been buying or attempting to buy from whoever would sell any kind of grain, either wheat or oats—there was no other grain moving at that time—and they were buying from anybody, from the farmer or from a broker or an elevator man, or a scoop shoveler, legitimate or illegitimate. As to my swearing that Keith was doing that, I will say I was not with him. I cannot swear from personal knowledge. In this conversation between Keith and myself he admitted he had been conducting business in that manner, and said that they would cease to do so if we would sell them a certain quantity of oats at a certain price, or said, rather, Mr. Keith said he believed his company would do that, would cease from buying from illegitimate dealers or farmers in the territory in which we had investments, where our elevators were located. * * * At that time he asked me to wire his house, offering and stating at what I would sell them oats and how many I would sell under that provision, and I told him we had not solicited any of their business, and we did not propose to make any advances, if they wanted to continue the fight to go ahead, that I proposed to make no advances, but I would like to make some money in the territory, would like to have them give me an opportunity to do so." With reference to the conversation between himself and Dowing, Keith testified: "When I went back to Amarillo and saw Dowing and tried to make a purchase from him, he made the objection that I was invading his territory. He asked me why we did not and would not buy from responsible, reliable dealers, and I told him we certainly would. I was there to buy from him, ready to make a deal right that minute. I don't know whether it was he or his partner who made the objection that we were up there trying to buy grain without going in the regular channels, but I rather think it was his partner. That objection was made to me while I was there. It is a fact that I left there with the understanding that I would report the situation to my house, and that I would recommend to them to come to an understanding with him that we would deal only and buy only from legitimate dealers in his territory. That was the substance of our conversation; and I did come back to Ft. Worth and talk the matter over, and they came to the understanding that they would do business on that basis, and sent this telegram of July 2d that has been offered in evidence." The telegram referred to was partly in cipher. Translated it was as follows: "Ft. Worth, Texas, July 2, 1908. Star Mill & Elevator Co., Amarillo, Texas. Will buy from legitimate dealers only conditional you sell us 50,000 bushels No. 3 oats red-sacked at 46 cents delivered Fort Worth. Subject to your immediate reply by telegram. Ft. Worth Grain & E. Co." It appeared from the testimony that the term "legitimate dealers" was understood by the parties to mean persons financially and morally responsible, regularly engaged in the grain business, and did not include growers, "curbstone brokers, and that class of people." July 3d the appellant company telegraphed the appellee company as follows: "Will book 25,000 bushels. Subject to your immediate reply by telegram." This telegram was followed by other communications between the parties, resulting in a contract whereby the appellant company undertook to sell to the appellee company 25,000 bushels of No. 3 or better red oats at 46 cents per bushel sacked f. o. b. Ft. Worth, between July 1 and September 30, 1908. Keith testified: "There is a class of dealer that does not come within the description of legitimate dealer, and I agreed not to deal with that class. I, of course, was not to deal with farmers. They would not come within the description of dealers at all. We wouldn't buy wagon loads or anything like that. We had no intention of do-

ing that; couldn't afford to do that. I understand that the terms of our contract excluded our going to a man not regularly in the business, and have him to sell us a car that he might have gathered up from the farmers, and we would not have done that, contract or no contract."

There being no testimony to the contrary, we think it must be said to have conclusively appeared from the statement made from the record and testimony recited above (1) that appellee and appellant each was engaged in buying grain in the Panhandle; and (2) that they entered into an agreement or understanding whereby appellee bound itself not to buy grain from growers thereof, curbstone brokers, and other persons in that section of the state not regularly engaged in the grain business. That agreement or understanding plainly was in violation of the letter of the portion of the statute quoted above. It is insisted, however, that there was testimony tending to show that appellant had never in fact prior to the time the understanding was reached purchased grain in that territory of the class of persons it thereby bound itself not to purchase from; that appellant and appellee were not prior to that time, nor at any time, competitors as purchasers of grain from that class; that it was contemplated when the agreement was entered into that they would continue to be, as they had been before, competitors as purchasers from "legitimate dealers"; and that the agreement did not operate to destroy or in any way affect competition existing between them before it was entered into, or which it was contemplated might exist between them. This character of testimony, it is argued, notwithstanding the other testimony referred to, made the issue as to whether the agreement was in violation of the statute or not one for the jury, and not the court, to determine. We do not think so. The Legislature in the portion of the act set out carefully defined what it meant by a "conspiracy in restraint of trade." To hold that such a conspiracy involved an intent of the parties to prevent competition, or that the agreement should actually operate to prevent competition between them, would be to add to the definition qualifications we think we have no right to add. There is nothing in the statute indicating that the Legislature did not mean what it said, and that it intended its definition to be so, or otherwise, limited. The purpose, we think, as indicated by the scope of the statute and the language used, was to denounce as illegal, without reference to the intent of the parties and without reference to its actual effect, every agreement or understanding between parties engaged in buying any commodity, whereby they, or either of them, was to refrain from buying such commodity from any one having same for sale. State v. Racine Sattley Co., 134 S. W. 403.

[3] The testimony being undisputed that appellant and appellee each was engaged in buying grain in the Panhandle, and that by the understanding reached between them appellee was to refrain from buying grain of growers and others not embraced within the meaning, as stated, of the term "legitimate dealers," the trial court should, we think, have dismissed the suit. In the twelfth section of the statute it was expressly declared that any agreement in violation of its provisions should be "absolutely void, and not enforceable either in law or equity." Gust Feist Co. v. Albertype Co., 109 S. W. 1139; Id., 102 Tex. 219, 114 S. W. 791.

The judgment will be reversed, and the cause dismissed.