## WOODS v. AMERICAN BREWING ASS'N.
### (No. 57.)

(Court of Civil Appeals of Texas. Beaumont. Jan. 20, 1916. Rehearing Denied Feb. 10, 1916.)

1. MONOPOLIES ⊜⟶17—COMBINATIONS IN RESTRAINT OF TRADE — EXCLUSIVE RIGHT TO SELL BEER—STATUTE—"MONOPOLY."

A contract whereby a brewing company, in consideration of plaintiff's payment of a $2,400 debt owing to it by its agent, agreed to give plaintiff the exclusive right to sell its beer in Orange county, plaintiff to pay a fixed price, ordering the beer as he sold it and paying storage and selling expenses, there being no limitation upon the price he might charge his customers, not the retail consumer but saloon men, nor any prohibition upon his purchasing and selling the product of other breweries, was not violative, as a conspiracy in restraint of trade, of the Texas Anti-Trust Act (Vernon's Sayles' Ann. Civ. St. 1914, arts. 7796, 7797, and 7798), defining trusts, a "monopoly" as a combination or consolidation of two or more corporations, and providing what acts shall constitute a conspiracy in restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ⊜⟶17.

For other definitions, see Words and Phrases, First and Second Series, Monopoly.]

2. FRAUDS, STATUTE OF ⊜⟶49 — AGREEMENT NOT TO BE PERFORMED WITHIN ONE YEAR—AGENCY CONTRACT.

An oral contract whereby a brewing company, in consideration of plaintiff's assumption of a debt to it, agreed to give him the exclusive right to sell its beer in Orange county, there being no express agreement as to the length of time the agreement should run, though for plaintiff to reimburse himself it would have to run for two or three years, was not invalid under the statute of frauds as a contract not to be performed within a year.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 74; Dec. Dig. ⊜⟶49.]

Appeal from District Court, Orange County; A. E. Davis, Judge.

Action by W. C. Woods against the American Brewing Association. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

---

⊜⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Holland & Holland, of Orange, for appellant. Fisher, Campbell & Amerman, of Houston, for appellee.

BROOKE, J. This is an action for damages for breach of contract brought by appellant against appellee, and the cause has been properly appealed.

[1] Plaintiff's cause of action, as stated in his petition, is as follows:

Plaintiff is a private citizen, residing in Orange county, Tex. Defendant is a corporation incorporated under the laws of Texas, its principal office and place of business being at Houston, Harris county, Tex.

"That heretofore, to wit, on or about March 28, 1908, the defendant was engaged in the business of manufacturing beer in Houston, Harris county, Tex., and as a part of its said business, and for the purpose of conducting and carrying on profitably its said business, it maintained an agency for the sale of its product at Orange, in Orange county, Tex.; that at said time it made the sales of its product in Orange county, Tex., through its said agent in Orange county, Tex., and for said purpose it had at said place an agent, through whom it conducted its business; that in the conduct of its business at said place, it consigned to its said agent at a certain price, the agent in turn selling said product to dealers at a profit remunerative to said agent, and justifying said agent to engage in said business; that defendant during said time made no sales of its product in Orange county, Tex., except through its duly authorized agent, as hereinbefore shown, and it consigned no portion of its product direct to the consumer, and all sales of its product in Orange county entitled said agent, by virtue of the arrangement between them to a certain profit; that on or about said date the agent of the defendant company, being in arrears with it, to the extent of approximately the sum of $2,400, and being indebted to it in approximately said sum, which indebtedness had extended over a considerable period of time, and the business of defendant suffered on account thereof, and it faced on account thereof financial loss, approached this plaintiff, and made with him the following verbal agreement, to wit:

"If plaintiff would accept the agency of the sale of defendant's products in Orange county in such manner as to represent the interests of the defendant company, said agent purchasing direct the product of the defendant from the defendant company and making sales thereof himself to the dealers in Orange county, said product to be invoiced to plaintiff by the defendant company at a price then and there agreed upon, and to be sold by the plaintiff to the dealers thereof at a profit, and would pay to the defendant company for such business and agency said amount owing to it by its former agent or its then agent, and amounting approximately to the sum of $2,400, that the defendant company would execute a contract with the plaintiff for the conduct by him of their business in Orange, Tex., and appoint plaintiff its exclusive agent at said place, and would continue permanently to sell him and no other person, except through him, goods of its manufacture or its product, thereby entitling plaintiff to the profits arising from the sale of said product, so long as the defendant conducted its business in Orange, Texas, or held or kept an agent at said place, all of which was consented to and agreed upon by the plaintiff, and said contract between the parties became mutual and binding, and plaintiff in good faith entered upon the duties of said business and agency.

"That under said agreement and agency plaintiff conducted said business of the defendant company and handled its product in Orange, Texas, for a considerable period of time, both parties recognizing said contract as valid and binding, and as permanent, and as to continue in force so long as the defendant company maintained its said business or agency in said place; that after the conduct of said business by the plaintiff to a period when plaintiff had repaid to the defendant company said full sum of money owing to it, by its former agent, and assumed by plaintiff, and amounting to approximately the sum of $2,400, and on, to wit, about May 1, 1914, the defendant company, ignoring its contract, terminated said business and agency with plaintiff and immediately commenced the sale of its products, through other persons than the plaintiff, and thereby willfully, knowingly, and arbitrarily destroyed the business of plaintiff, which, through a considerable period of time he had built up and from which, through his exertions, he had earned a sufficient amount to make the defendant whole, and pay to the defendant company the sum of money owing to it by its former agent; that the business of plaintiff and the agency established by the contract hereinbefore referred to was valuable, and was reasonably worth on the market the sum of $10,000, and by the arbitrary acts of the defendant company in destroying said business, and annulling said agency, this plaintiff was without fault on his part deprived of the value thereof, to his damage in said sum of $10,000; that the payment of the $2,400 hereinbefore referred to by the plaintiff to the defendant was obtained by the defendant from plaintiff upon a fraudulent, false, and wrongful agreement that it would maintain permanently so long as it was in business, a local business at Orange with plaintiff as its agent, for the sale of its products, and would through no other channels sell the same at Orange in Orange county, Tex., and upon such agreement said sum of money was so paid by plaintiff to defendant, and the defendant having breached said agreement and violated the same, thereby obtained said sum of money from plaintiff fraudulently and without warrant in law, and is entitled to repay the same to plaintiff, with legal interest thereon, and thereby has damaged plaintiff in said additional sum of $2,400, with legal interest thereon from the date of its payment."

Defendant company filed its plea of privilege to be sued in the county of its residence, filed general and special demurrers and general denial, and further set up that the contract, as alleged, was within and contrary to the statute of frauds, and further alleged that the contract was not for any definite period of time, and was a contract which the defendant had a legal right to terminate at any time, and further alleged in said answer that if it was shown that the defendant company made any contract with plaintiff, that said contract did not provide that the defendant should sell its product in the city of Orange or Orange county exclusively, with the plaintiff, and with no one else during the continuation of said contract, and that therefore this defendant had a right at any time to sell its products to any other person or persons within the city of Orange, without liability to the plaintiff.

For further answer the defendant company alleged by its pleadings that if it was shown that any contract was made between it and the plaintiff, that it was necessarily contemplated and implied by said contract that the plaintiff use reasonable diligence in attending to his business and in supplying the produce of defendant to those who were in

the habit of purchasing, using, and selling such products, but the defendant company says that the plaintiff negligently and willfully failed and refused to attend to his said business, and to use diligence and care in looking after the same, and failed and refused to order and pay for and receive from the railroad company and deliver the product of this defendant to those who desired to purchase the same, and gave orders to plaintiff for the purchase thereof, to the extent that often for several days at a time those persons desiring to purchase were not able to obtain the product of this defendant in using and selling to their customers, greatly to the damage of the defendant company, and by reason of the failure of the plaintiff to use care and diligence, and attention to his said business in selling and delivery of the goods and products of the defendant, and in ordering said goods from the defendant, he breached and violated the terms and provisions of any contract it may be shown he had with the defendant; therefore defendant was compelled to sell and was justified in selling its product to other persons within the city of Orange and Orange county.

The court, after instructing the jury to find a verdict for the defendant, approved and ordered filed plaintiff's bill of exceptions, as follows, with the following qualification:

"Be it remembered that upon the trial of the above-entitled cause, and after the plaintiff had rested in said trial, the defendant moved the court, by written motion, to instruct the jury to return a verdict in favor of the defendant, which said motion was resisted and objected to by the plaintiff, but the court overruled plaintiff's objection, and sustained said motion, upon the grounds urged and presented to the court that said contract, as pleaded and proven, was in violation of the anti-trust laws of the state of Texas, and for that reason unenforceable and void, and upon said ground instructed the jury by a written instruction, to return a verdict in favor of the defendant, which instruction was read by the jury, and a verdict in favor of the defendant, in obedience thereto was returned, to which plaintiff at the time in open court excepted, and now here tenders this, its bill of exception, and prays that the same be allowed and ordered filed, which is accordingly done.

"Holland & Holland,
"Attorneys for Plaintiff.

"The foregoing bill of exceptions hereby approved and ordered filed, this May 17, 1915, with the following qualification: That the proof showed that the contract was in violation of the anti-trust laws of the state of Texas.

"[Signed] A. E. Davis, Judge Presiding."

The testimony was entirely the testimony of the plaintiff, save and except letters that were written by plaintiff to the defendant company, and letters written by the defendant company to the plaintiff. The evidence will be practically set out in full.

Plaintiff testified:

"My name is W. C. Woods. I am acquainted with the American Brewing Association. About January 1, 1911, they were engaged in the business of making and brewing beer at Houston, Tex. They were at that time doing business at Orange through an agent, and were selling beer that they had manufactured. I was their agent here at one time, and Capt. Boland was

their agent before me. This company has been doing business in Orange in that way for about 12 or 14 years. Their manner of doing business was: They would bill the shipment to the agent, and the agent would sell it to the saloons, and that is the way they sold it through Capt. Boland. There was a certain price that they sold it to Capt. Boland for, and then he would sell it for more than that. * * * The American Brewing Association did not sell through any other agency here. As to whether or not at that time I knew Capt. Boland was indebted to them, I will say he was indebted to them about $2,400. I made an agreement with reference to the agency and the payment of this indebtedness. I agreed that, if they would turn the agency over to me, I would pay them the $2,400 that Boland owed them. They were to give me the entire agency that Capt. Boland had. He had the agency of American Brewing Association. * * * I was to get the beer, and sell it to the saloon men, and then collect for it. The agreement was to last as long as they had an agency here, and I was to pay them the $2,400 that Boland owed them, and I did pay them that amount. They shipped me beer according to that agreement for 5 or 6 years, I guess, on this same agreement. I guess I was 4 or 5 years paying back the $2,400 that Mr. Boland owed them. I paid back the entire amount. I was in no way responsible for that debt, except by this agreement. I would order this beer direct from the American Brewing Association at Houston, Tex., and would purchase the beer at $7 and would sell it at $9 to the saloon men. They recognized this agreement for 4 or 5 years, I guess. They ceased to recognize it about the 28th day of January, 1914. At that time I had some beer consigned to me here in accordance with the contract that I had with them at that time. They turned the beer over to Mr. Seastrunk, and have never shipped me any beer since that time. With reference to further shipments, they told me that they had turned the agency over to Mr. Seastrunk. Mr. Sass, the representative of the brewery, who attended to their business over here, told me that they had canceled their contract with me. They destroyed my agency or business over here, and since that time I have not been able to handle any other beer, and they haven't shipped me any. I think, the year before they ceased to ship me beer, my business or the profit on my business was about $5,000 for keg and bottle beer together. They handled the American beer; that was the bottle beer. I think it was 30 cars of keg that I have sold and bought under this agreement in 1913. There was some 60-odd of half cars. My profit was $115 per car. I had to pay for help and feed for the horse out of that. The business that I had in 1914, compared to that in 1913, was getting better. The business I had in 1912 was not as good as that in 1913. The year 1913 showed a net profit, not deducting expenses, of about $5,000, and 1914 was a better year than 1913. I don't know how 1915 is up to the present time. There is more beer sold in 1915 than in 1914. It shows a similar increase during this year, and the probability is that the business of 1915 will be better than that of 1913. The profit was $115 on a barrel, and a barrel is two kegs, which makes a profit of about $115 per car, which amounted, in connection with the bottle beer, to at least a profit of $5,000. The company has not repaid me any part of that $2,400. I did all I could for them."

Upon cross-examination he testified:

"I made this contract with American Brewing Association before January, 1915. * * * It was about that time, it might have been a year or so before that. * * * I will say it might have been 1908. I did not get with Capt. Boland and discuss the matter before I made the arrangement with the association. The association did not make me a proposition, and I then

made a proposition to Capt. Boland. Capt. Boland owed the American Brewing Association, and he told me that he was up against it, and wanted me to help him get his car out. The agent had an office here, and I was pretty well familiar with his business. I was selling the Schlitz bottle beer at that time to the saloons at Orange. I had been selling Schlitz beer about 9 years before I made the agreement with the American Brewing Association. I had been selling beer at that time about 8 years, and was engaged in that business at the time I made the agreement with the association. I did not make any trade with Capt. Boland before I made the agreement with the association. I was acting as agent for the Magnolia Company, and he for the American, and I helped him get his car out some time. As to whether Capt. Boland would sign an order to the association for such as he wanted shipped to him, I will say that we got a car together, Capt. Boland and I. I got mine from the Magnolia Company and he got his from the American. I would buy from the Magnolia and he from the American. * * * He owed them the $2,400 for beer that he got years before that. He never got in debt to them after I went in with him. During the time I was connected with him, he would put in his orders for the beer, and they sent the beer to him with draft attached to the bill of lading, and he had to pay for the beer before he got it out, and after he got it out it was his property, and he sold it to the saloon men; that is his part of it. In Capt. Boland's business with the American Brewing Association, he paid for the beer when he received it from the railroad company. I had the agreement with the American Brewing Association at their office in Houston. I had discussed the matter with Capt. Boland before I went to Houston, but not the question of buying his part over. No; I had not talked that part over. He got so he couldn't take out his car, and he told me that I would have to do the best I could, and I went and talked to Mr. Autrey about it. He represented the association. I talked the matter over with Capt. Boland about taking the car out before I went down to see Mr. Autrey. * * * I did not talk to him about taking the agency before I went to Houston. He said: 'You will have to do the best you can. You will have to go and see them and do the best you can.' And I told him I would go and try to make some arrangement. * * * I already had the Magnolia agency, and I didn't know that Capt. Boland owed them that amount, and they, said, if I would pay the $2,400 that he owed them, I could take the agency. They made me the proposition that if I would assume the payment of Capt. Boland's indebtedness of $2,400, they would give me the agency for their beer. It was the understanding that, instead of shipping the beer to Capt. Boland, they would thereafter ship it to me. It was the understanding that I would send in my orders for such beer that I desired. If I wanted keg beer, I would send in my order for so much keg beer; and if I wanted bottle beer, I would send in my order for so such, and they would not send any except what I ordered, and when they would send that they would bill it direct to me. The agreement as to how I would pay for that beer was that they would give me a car's credit on the start, and I was to pay for the beer as the cars were sent after that. Following that, the understanding was that they were to draw a draft against me with bill of lading attached for each shipment of beer, and I was not to get that beer until I paid for it, until I paid that draft. Then, when I paid that draft, of course, the beer became mine, and I sold it. I got out in town and sold my own beer, and I sold it to whoever I pleased, for cash or credit, and how I pleased. That was the understanding. The agreement that was entered into between me and the American Brewing Association was, as alleged in this pleading here, that if I would accept the agency for the American Brewing Company's products in Orange county in such manner as to represent the interests of the defendant company, said agent purchasing direct the products of the defendant from the defendant company, and making sales thereof myself to the dealers, in Orange county, and said products to be invoiced to me by the defendant company at a price then and there agreed upon, and to be sold by me to the dealers thereof at a profit, and would pay to the defendant company for such business and agency said amount owing to it by its former agent, Mr. Boland, and amounting approximately to the sum of $2,400, the defendant company would exclusively contract with me for the conduct by me of their business in Orange, Tex., and appoint me its exclusive agent at said place, and, would continue permanently to sell me and no other person, except through me, goods of its manufacture or its products, thereby entitling me to the profits arising from the sale of said products, so long as the defendant conducted its business in Orange, Tex., or held or kept an agent at said place, all of which was consented to and agreed upon by the plaintiff, and said contract between the parties became mutual and binding. That the payment of $2,400 hereinbefore referred to by the plaintiff to the defendant was obtained by the defendant from plaintiff upon a fraudulent, false, and wrongful agreement. That it would maintain permanently, so long as it was in business, a local business at Orange, Tex., with me as its agent, for the sale of its products, and would, through no other channels, sell the same at Orange, in Orange county, Tex., and upon such agreement said sum of money was so paid, and the defendant having breached said agreement, and violated same, thereby obtained the said money from me fraudulently and without warrant in law, and is entitled to repay the same to me, with legal interest thereon, and thereby has damaged me in said additional sum of $2,400, with legal interest thereon from the date of its payment. It is my understanding that they did agree to do the things that I there say they did. It was agreed that I should pay them $7 per barrel for the beer, and, after I paid them for it, it became my property, and I sold it to whoever I pleased, and on any terms I pleased. After I got back from Houston, after I made the deal with them, I did not make any arrangements of any kind with Capt. Boland for taking over his business. I had taken the car that was sent to him, and sold it to his customers. I did not submit to Mr. Boland any proposition. I didn't recognize that Mr. Boland had any rights in the matter. I told him of the arrangements I had made with the association, and I told him I had agreed to pay his indebtedness to the association. As to whether or not he agreed to turn over what interest he had to me, I will say that he didn't have any interest in the business. He asked me to buy his safe and desk. * * * I agreed to pay this $2,400 debt at the rate of $75 per month. I guess I was 4 or 5 years altogether in paying off that indebtedness. I got pretty near out once, and borrowed $600, and then borrowed $400 again. I don't know exactly how long I was in paying off that $2,400. I will say that I paid one or two of the $75 payments, and then I went to paying their cold storage for them. I don't know how much I had paid before February, 1909. * * * I will say that I told Capt. Boland what I had done, and that I had agreed to pay that $2,400, and he said the same was satisfactory to him."

Witness being shown a letter signed "Woods per Boland" to the American Brewing Association, and asked whether it was an order for beer sent to the association, or a letter in reference to beer, replied:

"That is a letter that Mr. Boland wrote to them. He wrote it. It is signed Woods per

Boland. He wrote that under my direction, and this is the billhead I was using. After I was buying from the American Brewing Association, I was also buying from the Houston Ice & Brewing Company and Pilsener Company. * * * The association did not pay me any salary. The only profit I got out of the transaction was the difference between what I paid for the beer and what I sold it for. If I sold a bad account, that came out of my profit; and if I lost on the collections, I had to stand the loss. In my agreement to pay the $2,400 of Boland's account, I was induced to pay that or assume that amount by them agreeing to give me the exclusive purchase of their beer, and I couldn't have been induced to pay that indebtedness without them giving me the exclusive sale of their beer. I don't know exactly how long they had been selling beer to one person in Orange, but it was about 10 or 12 years or something like that. It was the understanding between us that this contract that we have been discussing would extend over several years' time. I couldn't hope to pay that $2,400 and make a profit, unless I should continue that contract over 4 or 5 years. It was the understanding that it would extend a sufficient length of time after I had paid this amount that I would get back that money; that I would pay that Boland account out of the profits made in the sale of the beer. It wasn't paid exactly out of that either. I had two more agencies; but I got the assurance that I could keep the agency long enough to pay it out of the sales of their beer alone, and it would take about 3 or 4 years at least to pay that Boland account. I maintain an office here, and rented a building. I keep one wagon and one horse. I owned the horse and they sent me the wagon. I work one man and paid him a salary. About the latter part of January last, they began to sell beer to Mr. Seastrunk, and turned over a part of a car to him. I don't know exactly how long that car had been on the track here, that was sold to Mr. Seastrunk, but it was about a day or two, I guess. It might have been here 3 or 4 days. I hadn't taken up the bill of lading, but I had beer on hand. I ran out of beer the day they turned it over to Mr. Seastrunk. I have not placed any orders with them since that time."

There were offered in evidence letters from the American Brewing Association to W. C. Woods, on the following dates: April 11, 1911, May 27, 1913, August 6, 1913, and May 17, 1913.

Said witness further testified:

"Beginning with the date of this first letter of April, 1911, and extending on down to and including January, 1914, there were days when my customers couldn't get American beer for several days at a time, when they couldn't get it from me, and I was the only one that sold American beer here. At these times when they couldn't get this beer from me, and they would demand American beer particularly and I had run out, I would order it from Beaumont. It is a fact that there were times between these dates when I was out of beer, and the people were in the habit of demanding American beer and they were not getting it. I didn't order any beer from Louisiana, but I got some from Beaumont. Since the Brewing Association has quit selling beer to me, I haven't been selling any beer; I do not still handle beer for the Houston Ice & Brewing Association, nor for the Schlitz Company. I haven't sold any beer from anybody, or purchased beer from anybody, manufactured by any beer concern, since the American Brewing Association began selling to Mr. Seastrunk, except that I sold for the Magnolia and Schlitz beer for a month or two—a couple of months, I think. The Magnolia people sold draft beer and bottled beer, and the Schlitz

Company sold the bottled beer alone. During 1913 I was handling beer both from the Magnolia Company and the American Brewing Association. The Magnolia Company is owned by the Houston Ice & Brewing Company—it is the Brewing Association now, I think. When I would order out a car, I would have them ship generally about half a car by the association and half from the Magnolia Company. That was the way that it was shipped out in 1913 and up to the time that they began selling to Mr. Seastrunk. The Houston Ice & Brewing Company agreed that they wouldn't sell to anybody except me; I had the same agreement with them that I had with the American Brewing Association; when I agreed to take that indebtedness over, I took it from both of them. I know something about the Galveston Brewing Company; I have been there, and know that there is a concern that manufactures beer known as the Galveston Brewing Company, and also know that there is a brewery in San Antonio by the name of the Lone Star Brewing Company, and another by the name of the San Antonio Brewing Association that manufactures beer. I have heard of one in Dallas known as the Dallas brewery. I think there are two breweries in New Orleans, and I know there is one. These breweries were all in the business of manufacturing and selling beer during the years 1913 and 1914. It is 200 and some odd miles from here to New Orleans, and 105 miles from here to Houston; this isn't quite half way from Houston to New Orleans. L. T. Grubbs handles the Houston Ice & Brewing Company's beer here; I am not connected with him in any way. If the American Brewing Association had kept on with me and hadn't begun to sell beer to Mr. Seastrunk, I wouldn't have brought this suit."

"The reason that I didn't order any more beer out from the association, after they had turned the agency over to Mr. Seastrunk, was because they had gotten another agency, and had taken Mr. Seastrunk as their agent, and they had taken the half car that I had ordered, and got the railroad company to release it, and gave it to Mr. Seastrunk. I think it was Mr. Sass that notified me that he had given the agency to Mr. Seastrunk, and the railroad company turned the car over to him; and that was my reason—because the agency was turned over to Mr. Seastrunk. There were several times when I was out of the association beer, Mike Grubbs went to driving for me on the 12th day of May, 1913, and continuously drove the wagon for me up to the time that the agency was taken from me, and it was taken from me on the 28th of January, 1914. He drove for me from May until the following January. I think it was four or five times that I was out of association beer during that time; I took it down yesterday, and I can tell you for how long in a minute. I can tell you how many times I was out since Grubbs went to work for me. Beginning with May—he went to work on the 12th of May—I was not out of beer any during May, June, July, August, or September; the only day I was out in October was on the 29th; and I was out for two days in November, on the 26th and 27th; none in November; then I was out on Monday, the 19th of January. That is four days and three occasions in which I was out of beer during that time. The cause of me being out of beer on November 26th and 27th was that I had ordered a car of beer on the 21st and the brewery owed me for bottles and freight to the amount of $178.20 for the freight and bottles that I had sent in. There was no dispute about them owing that. I have got their statement now. I wrote them to give me credit for the bottles, and the balance due me on the car. The car was ordered out on the 21st and got here on the 24th; and they notified me they had sent the bill of lading with the car. I phoned them, and it was on the 26th, I think,

that they notified the bank to give me credit for the amount and release the car, and on the 27th they sent Mr. Sass over here, and on the 28th it seems that they released the car to me. The car was here at the time I was out, and they sent it out without giving me credit for this amount. At one time the cause of me being out of beer was on account of the Magnolia Company making the mistake, and instead of shipping it over the S. P. they routed it over the Frisco, and made it a day late; that was in October, I think; it was one of those days that I have mentioned. It was not customary for them to ship it that way; they had never done it before. I did not order it shipped that way; it was done through some error of the shipping clerk; and it would have been here on time if they had shipped it the regular way. These are the only times that I was out during the 10 months. There was no complaint that I know of during that time from my customers of me being out of beer or their wanting beer. Prior to that time I was out of beer sometimes; lots of times it was because when I would send in the order they would be short of cooperage—that is, short of kegs—it was both of the breweries that didn't have them; and then you take in August they can't get the cars when they ought to be shipped. Part of the time, if not all of the time, my being out of beer was not my fault, and part of it was the fault of the breweries. I can't tell how often it occurred that the shipments were delayed by them being out of cooperage, but it was several times, and several times it was their failing to ship on account of car shortage. I was asked the question if I had made the same kind of a contract with reference to the exclusive agency with the Magnolia people—the Magnolia people complied with their contract with me. From the time that I made the contract for the exclusive agency with the Magnolia people—the Magnolia people complied with their contract with me. From the time that I made the contract for the exclusive agency and sale of beer with the American Brewing Association up to the time that they canceled that agency, they sold to no other person except through me, and up to that time they complied with their agreement. After being shown a letter from me here, I state now that according to that letter the contract that I entered into must have been on March 28, 1908; that letter was written after I came back from Houston. That is the same contract that I am suing on, and I have never made but one contract with them. I stated that when I was out of beer I would order it from Beaumont, and sometimes I would pay for it, and sometimes they did; I paid the freight and express, or I paid them back if they paid it."

Being asked who paid the loss to the trade, if anybody, when he ordered beer to supply them when he was short, he answered:

"I paid it myself, except to Mr. Futch, and he wouldn't take it. I lost a dollar profit and he would not let me pay the freight. When I ordered beer in this way I lost a dollar profit and 60 cents expressage. I made this loss each and every time that I failed to get the beer from the association when the trade wanted it, whether it was through their fault or mine. I never at any time failed or refused, when short of beer, to try to get it as soon as possible. I couldn't ascertain the number of times that I was short prior to the time that I have a record here."

Article 7796, Vernon's Sayles' Statutes, defines trusts as a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them for any or all of the following purposes:

(1) To create or which may tend to create or carry out restrictions of trade or commerce or aids to commerce, or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state.

(2) To fix, maintain, increase, or reduce the prices of merchandise, produce, or commodities or the cost of insurance, or of the preparation of any produce for market or transportation.

(3) To prevent or lessen competition in the manufacture, making, transportation, sale, or purchase of merchandise, produce, or commodities or the business of insurance, or to prevent or lessen competition or aids to commerce or in the preparation of any product for market or transportation.

(4) To fix or maintain any standard or figure whereby the price of any article or commodity, merchandise, produce, or commerce, or the cost of transportation or insurance, or the preparation of any product for market or transportation, shall be in any manner affected, controlled, or established.

(5) To make, enter into, maintain, execute, or carry out any contract, obligation, or agreement, by which the parties thereto bind or have bound themselves not to sell, dispose, or transport or prepare for market or transportation any article or commodity, or to make any contract of insurance at a price below a common standard or figure, or by which they shall in any manner agree to keep the price of such article or commodity or charge for transportation or insurance, or the cost of preparation of any product for market or transportation at a fixed or graded figure, or by which they in any manner affect or maintain the prices of any commodity or article or the cost of transportation insurance, or the cost of the preparation of any product for market or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in the sale, or transportation of any such article or commodity, or the business of transportation or insurance, or the preparation of any product for market or transportation, or by which they shall agree to pool, impede, or unite any interest they may have in connection with the sale or purchase of any article or commodity, or charge of transportation or insurance, or charge for the preparation of any product for market or transportation, whereby the price or such charge might be in any manner affected.

(6) To regulate, fix, or limit the output of any article or commodity which may be manufactured, mined, produced, or sold, or the amount of insurance which may be undertaken or the amount of work that may be done in the preparation of any product for market or transportation.

(7) To abstain from engaging in or continuing business or from purchasing and selling merchandise, produce, or commerce, partially within the state of Texas or any portion thereof.

It has been held under the above article: That the promise by a merchant to the purchaser of his stock to retire from business in the town for one year does not constitute a trust. Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079. That an agreement not to engage in a particular business for 2 years is not in violation of the trust law, or against trade. Erwin v. Hayden, 43 S. W. 610. That an agreement that if defendant ceased to teach music in plaintiff's school that he would not teach in a certain town, is a binding contract, and not in violation of the foregoing article. Patterson v. Crabb, 51 S. W. 870. That a contract of the seller on the sale of merchandise and goods to refrain from such business for 20 years within the county in which the sale is made, is not invalid, as an unreasonable restraint of trade. Tobler v. Austin, 53 S. W. 706. That an agreement by a doctor not to practice his profession within 10 miles of a certain town for 10 years is not void as against public policy, and is not in conflict with the law to prevent a combination or restraint of trade. Wolff v. Hirschfeld, 23 Tex. Civ. App. 670, 57 S. W. 572. That an agreement by an owner on the sale of his business and good will not to re-enter said business until a specified time at a specified place, is not void as in restraint of trade. Comer v. Burton-Lingo Co., 58 S. W. 969. That a promise by a partner to a copartner purchasing the business of the firm, not to engage in such business in that town so long as the copartner remained in business in the town, is not void as in restraint of trade. Cump v. Ligon, 37 Tex. Civ. App. 172, 84 S. W. 250. That an agreement by the seller of a cotton gin and gristmill not to engage in that business so long as the purchaser operated there, was not in violation of this article. Malakoff Gin Co. v. Riddlesperger, 133 S. W. 519. That a contract with a railroad company to ship 66 per cent. of the output of salt of a company at as low rate as any other company, was not void as against public policy. Texas & P. Ry. Co. v. Shortline Ry. Co., 35 Tex. Civ. App. 387, 80 S. W. 567. That a contract between a railroad company and a sleeping car company, whereby the former grants to the latter the exclusive right to furnish sleeping cars to be used on a railway company, and on all lines controlled by it, and all roads which it might subsequently acquire or operate, is not in restraint of trade, and does not violate the anti-trust law. Ft. Worth & D. C. Ry. Co. v. State, 99 Tex. 34, 87 S. W. 341, 70 L. R. A. 950. That under this article a petition which alleges that a manufacturer of foreign implements and vehicles entered into a contract with a dealer therein, whereby the manufacturer agreed to give the dealer the exclusive sale of its product, and whereby the dealer agreed not to buy or sell *any other makes of like goods* (italics ours), and that the manufacturer and dealer carried the contract into execution, *to the injury of the people* (italics ours), charges a violation. State v. Racine Sattley Company, 134 S. W. 400.

Article 7797 defines a monopoly as being a combination or consolidation of two or more corporations, when effected in either of the following methods:

(1) When a direction of the affairs of two or more corporations is in any manner brought under the same management or control for the purpose of producing or where such common management or control tends to create a trust, as defined in the first article of this chapter.

(2) Where any corporation acquires the shares or certificates of stock or bonds, franchise, or other rights, or the physical property or any part thereof of any other corporation or corporations for the purpose of preventing or lessening, or where the effect of such acquisition tends to effect or lessen competition, whether such acquisition is accomplished direct or through the instrumentality of trustees, or otherwise.

Under this article it has been held that a monopoly is not only an exclusive right granted by the state to a few of something which was before a common right, but embraces a combination, regardless of form; the tendency of which is to prevent competition and control prices, to the detriment of the public. Jones v. Carter, 45 Tex. Civ. App. 450, 101 S. W. 514. That where neither party to a contract giving an exclusive selling agency in a specified territory was a corporation, and there being no evidence of the combination or consolidation, the agreement was not in violation of this article. Nickels v. Prewitt Auto Company, 149 S. W. 1094.

Article 7798 provides that either or any of the following acts shall constitute a conspiracy in the restraint of trade:

(1) Where any two or more persons, firms, corporations, or associations of persons, who are engaged in buying or selling any article of merchandise, produce or any commodity, enter into an agreement or understanding to refuse to buy from or sell to any other person, firm, corporation or association of persons, any article of merchandise, produce or commodity.

(2) Where any two or more persons, firms, corporations or association of persons shall agree to boycott or threaten to refuse to buy from or to sell to any person, firm, corporation or association of persons for buying from or selling to any other person, firm, corporation or association of persons.

A brief review of the authorities might be beneficial:

In the case of Gates v. Hooper, decided by

our Supreme Court, and reported in 90 Tex. 563, 39 S. W. page 1080, the court says:

"This suit was instituted by appellant against appellee on the 2d day of May, A. D. 1896. The allegations in the original petition are as follows: That on the 14th of June, 1895, defendant [appellee], being then a merchant, and doing business as such merchant in the town of Batesville, in said county [Zavalla], entered into an agreement, partly verbal and partly in writing, with plaintiff [appellant], then and there also a merchant, and doing business in said town as such merchant, by which defendant agreed, bound, and obligated himself, for a valuable consideration moving from plaintiff, to retire from the mercantile business in said town of Batesville for the period of 12 months, and further agreed to use every effort to secure for the plaintiff all the patronage and custom that he had himself enjoyed in the trade of merchandise at said place, including his individual patronage and custom. That at said time defendant enjoyed a large and profitable trade in merchandise in and around Batesville. That at said time defendant did retire from business as he had agreed and covenanted to do. That in consideration therefor this plaintiff did purchase from defendant, at his earnest request, his stock of goods, wares, and merchandise then and there being, and assumed to pay for him outstanding bills for goods, and purchased large amounts of notes and accounts pertaining to defendant's mercantile enterprise, at his urgent request, all upon the faith of defendant's said covenant that he would not engage in any mercantile enterprise or business for the space of time aforesaid in the territory aforesaid. * * * Appellee demurred generally, on the ground that the contract set out in plaintiff's petition was illegal and void, as a restraint on trade, and, second, as preventing competition in the sale and purchase of merchandise. The general demurrer was by the trial court sustained, and, plaintiff declining to amend, the cause was dismissed. * * * It is not contended that the contract would be void if tested by the common law, but that it is a 'trust,' under our statute (Rev. St. 1895, art. 5313), as construed by this court in Queen Ins. Co. v. State, 86 Tex. 264, 24 S. W. 397 [22 L. R. A. 483]; Coal Co. v. Lawson, 89 Tex. 394 [32 S. W. 871] 34 S. W. 919; Welch v. Windmill Co., 89 Tex. 653, 36 S. W. 71; Brewing Co. v. Templeman, 90 Tex. 277, 38 S. W. 27; and Fuqua v. Brewing Company [90 Tex. 298] 38 S. W. 29, 750 [35 L. R. A. 241]. In order to constitute a trust, within the meaning of the statute, there must be a 'combination of capital, skill or acts by two or more.' 'Combination,' as here used, means union or association. If there be no union or association by two or more of their 'capital, skill, or acts,' there can be no 'combination,' and hence no 'trust.' When we consider the purposes for which the 'combination' must be formed, to come within the statute, the essential meaning of the word 'combination,' and the fact that a punishment is prescribed for each day that the trust continues in existence, we are led to the conclusion that the union or association of 'capital, skill or acts,' denounced is where the parties in the particular case designed the united co-operation of such agencies, which might have been otherwise independent and competing, for the accomplishment of one or more of such purposes. In the case stated in the petition there is no 'combination.' "

In the case of Vandeweghe v. American Brewing Company, 61 S. W. 526, Judge Key says:

"This is a suit on a contract for the sale of beer. The only defense relied on in this court is that the contract violates the anti-trust statute of this state. The only fact relied upon to show a trust is an agreement by the plaintiff

not to sell beer to any one else within a certain designated territory, contributory to the defendant's place of business. We think the case is distinguishable from the cases heretofore held to violate the anti-trust law, and within the doctrine announced in Gates v. Hooper, supra."

In the case of Norton v. W. H. Thomas & Sons Company, decided by our Supreme Court, reported in 99 Tex. 578, 91 S. W. 780, which came up on certified question, Judge Williams, rendering the opinion, said:

"The record on this appeal shows that in 1902, W. H. Thomas & Sons Co., incorporated under the laws of Kentucky, entered into a contract with H. N. Norton, resident of Galveston, Tex., whereby it agreed to sell to Norton 50 barrels of whisky of a named brand and age at a stipulated price per gallon. Under the agreement the corporation was to ship 100 barrels from Germany to Galveston, the first 50 above named to be a credit sale and Norton to have the option to take the second 50 barrels at the same price for cash. In pursuance of this agreement the whisky was shipped to Galveston and Norton took and * * * paid for the first 50 barrels according to the contract. The president of the corporation being in Galveston sought to induce him to take the other 50 barrels, but Norton declined to exercise his option, giving business reasons. Thereupon the president of the corporation offered the whisky on a credit, the debt to be evidenced by Norton's notes. As a further inducement the company agreed that it would not sell in Galveston, Beaumont, or Houston, * * * any liquor of that brand and age until Norton had closed out his purchase. * * * One of his defenses in the court below was that the contract of sale was within the provisions of the anti-trust law of 1899 and therefore void, and the question has arisen for our decision. 'In view of the holding [said the Court of Civil Appeals of the First District] in Troy Buggy Company v. Fife & Miller, 74 S. W. 956, the soundness of which we doubt, we respectfully certify for your decision: Was the contract void and the notes uncollectable by reason of the anti-trust law of 1899?' "

The court, after reviewing the sections of the act, among other things, said:

"Section 6, page 248, makes it unlawful for a person engaged in buying or selling articles, etc., [either] to enter into any pool, trust, agreement, etc., * * * 'or to limit competition in such trade by refusing to buy from or sell to any other person or corporation any such article,' etc."

The court further says:

"The sixth section might apply to the case but for the requirement that the pool, agreement, etc., to limit trade, or competition therein, by refusal to sell to others besides the parties to the arrangement, must be for the reason that such others are not parties to it. By this it is made clear that the offense denounced does not consist simply of an agreement between two that one of them will not sell to others, but of an association which seeks to limit trade or competition in trade in some article by confining the buying and selling thereof to the members of such pool, trust, agreement, etc., and by refusing to sell to or buy from others for the reason that they have not become such members."

In Forrest Photo. Co. v. Hutchinson Grocer Co., reported in 108 S. W. 768, the San Antonio court, through its Chief Justice, says:

"Appellant sought to recover the sum of $2,-850 from the Hutchinson Grocery Company alleged to have accrued to plaintiff on account of the failure and refusal of defendant to pay said sum to plaintiff under the terms of the following contract: * * * 'In consideration of 15,000

Tex.)                    WOODS v. AMERICAN BREWING ASS'N                         135

photo calendar trading tickets delivered to me by the Forrest Photographic Company, of San Antonio, Tex., each of said trading tickets entitling its holder to a photo art calendar, with his or her picture copied thereon, at the Forrest Photo. Co. studio at San Antonio, Tex., when traded out, and countersigned by me at my place of business, at Houston, Tex., etc., and it is agreed that, in consideration of this, the Forrest Photo. Co. will not sell to any other grocery company, after this date, the above-mentioned photo calendar trading tickets, without our consent. It is further understood that the only merchant grocery companies to which the Forrest Photo. Co. of San Antonio, Tex., have sold such photo calendar trading tickets to, in the city of Houston, Tex., are as follows: [Naming the parties.]' "

To the petition defendant filed a general demurrer and special demurrer. "The court entered an order sustaining the general demurrer, for the reason that the contract contravenes the statutes prohibiting trusts and combinations in restraint of trade. * * * Appellant's propositions, as regards the contract being in contravention of the statute, are in substance as follows:

"First. The petition does not disclose a combination of capital, skill, or acts of two or more persons, firms, corporations, or association of persons, or either two or more of them, for any of the purposes enumerated in the statute of 1903.

"Second. Appellee under said contract could purchase similar tickets from any firm engaged in the business of selling such tickets, and appellee was not bound to buy tickets exclusively from the appellant.

"Third. Appellant had the right to contract not to deal with any grocery company in Houston, Tex., except appellee, while the latter was disposing of his tickets; the business of no other such photographic company was interfered with.

"This proposition signifies that a corporation has a right to manage its own business to suit its pleasure, and advance its interests, no other business being interfered with.

"Fourth. Appellee was, in legal effect, appellant's agent."

The court, in passing on the matter, says:

"The question, then, is whether or not it is one which is declared void by the anti-trust statute of 1903, which was in force at the time the contract in question was made. We think not. That act defines trusts, monopolies, and conspiracies in restraint of trade. What would constitute a trust—that is, a 'combination of capital, skill, or acts of two or more persons, firms, corporations, or association of persons, or either two or more of them, for either, any, or all of the following purposes'—is the same in the act of 1903 as it was in the statute of 1895, being the act of 1889, under which latter statute the case of Gates v. Hooper arose, 90 Tex. 563, 39 S. W. 1079, wherein the Supreme Court held that a transaction of the nature of the one in question was not a union or combination of persons within the meaning of the act. In Norton v. Thomas & Sons Company, 99 Tex. 578, 91 S. W. 780, the Supreme Court points out that contracts such as the one we have here belong to a class usually treated as contracts in restraint of or imposing restrictions upon trade or competition. The statute of 1903 deals with conspiracies in restraint of trade, defining such to be: 'Where two or more persons, firms, corporations or associations of persons who are engaged in buying or selling any article of merchandise, produce or any commodity, enter into an agreement or understanding to refuse to buy from or sell to any other person, firm, corporation or association of persons, any article of merchandise, produce or commodity,' or, 'when any two or more persons, firms, cor-

porations or association of persons shall agree to boycott or threaten to refuse to buy from or sell to any other person, firm, corporation or association of persons, * * * any article, merchandise, produce or commodity.' If the transaction in question contravenes any of the provisions just referred to it is the first one, it clearly not falling within the second one. * * * In the first place, aids to commerce are not included, and the tickets issued by plaintiff, together with its obligation, to give to each holder of tickets an art calendar with his photograph upon it, embodies what is, in substance, a mere aid to defendant's business. * * * In the second place we think that the tickets, and the obligation of plaintiff to give the holders thereof calendars * * * was essentially a contract for service, to be rendered the defendant, rather than the sale of an article of merchandise, produce, or commodity. The transaction does not come within the class defined in the statute as 'monopolies.' "

In the case of Nickels v. Prewitt Auto Company, 149 S. W. 1094, Chief Justice Key says:

"The appeal involves but two questions, and these are: First, that the note sued on is part of a contract which contravenes the anti-trust statute of this state, and therefore the note is not enforceable, etc. The contract referred to shows that the note sued upon was executed in part payment for certain automobiles; and, among others, it contains this stipulation: 'And the said Prewitt Auto Company hereby gives the said J. A. Nickels the exclusive and sole right to sell the Moon Motoring Car Company's automobiles and supplies in the counties of Falls, * * * McLennan county, and the trade territory of Mart, and this right shall be in force until the 1st of October, 1911.'

"It is upon that stipulation that appellant bases the proposition that the contract is in conflict with the anti-trust statute, and therefore not enforceable. We overrule that contention, and hold the stipulation referred to does not require or authorize anything to be done that is prohibited by said statute. It merely conferred upon appellant an exclusive agency, in a restricted territory, and for a short period of time. It did not prohibit the other party from making sales elsewhere, nor did it attempt to fix prices or prohibit appellant from purchasing or selling other articles of the same kind obtained elsewhere [citing authorities].

"After due consideration," says the court upon motion for rehearing, "we have reached the conclusion that appellant's motion for rehearing in this case should be overruled. However, we are now satisfied that this court fell into error when it held that the stipulation in the contract set out in our former opinion merely 'conferred upon appellant an exclusive agency in a restricted territory and for a short period of time.' We now hold that the stipulation in question attempted to confer upon appellant the sole right to sell the Moon Motoring Car Company's automobiles and supplies in the territory mentioned; and the effect of it was to prohibit the Prewitt Auto Company, the other party to the contract, from making any sales of such property in that territory within the time prescribed, but we hold that neither appellant's answer, nor the proof submitted thereunder, showed any violation of the anti-trust statute of this state."

After setting out several of the articles, the court says:

"Article 7798. *Conspiracies Against Trade, What Constitutes.* Either or any of the following acts shall constitute a conspiracy in restraint of trade:

"(1) Where any two or more persons, firms, corporations or association of persons, who are engaged in buying or selling any article of merchandise, produce or any commodity, enter

into an agreement or understanding to refuse to buy from or sell to any other person, firm, corporation or association of persons, any article of merchandise, produce or commodity," etc.

"That the agreement of the Prewitt Auto Company not to sell the Moon autos and supplies in the territory designated did not constitute such a combination of capital, skill, or acts as is necessary to constitute a trust, as defined by the statute referred to, is settled by the decision of our Supreme Court in Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079. Both the pleadings and evidence fail to show that either of the parties to the contract was a corporation, and failed to show any combination or consolidation; and therefore it is neither claimed that the defense of monopoly was not sustained, nor did appellant's answer or the proof submitted thereunder show conspiracy against trade, as defined by the statute, because it was not alleged or proved that both or either of the parties to the contract were engaged in buying or selling automobiles, or any other article of merchandise. If it had been alleged and proved that the Prewitt Auto Company and appellant, Nickels, were each and both engaged in the business of buying and selling automobiles, a different question would be presented, and we might hold that the contract was in violation of the first subdivision of article 7798; but no such allegation or proof was made. That is the provision of the statute which appellant seems to contend was violated, but we hold that his pleading and the proof does not go far enough to show such violation. The language 'who are engaged in buying or selling,' etc., was evidently placed in the statute for the purpose of limiting that provision to merchants and others engaged in some particular business, and therefore, in order to show a violation of that provision, it is necessary to allege and prove that the parties to the alleged illegal contract were engaged in the business of buying or selling such articles as the contract relates to."

The court, in Star Mill & E. Co. v. Ft. Worth Grain & E. Co., says (146 S. W. 604):

"The purpose, we think, as indicated by the scope of the statute and the language used, was to denounce as illegal, without reference to the intent of the parties and without reference to its actual effect, every agreement or understanding between parties engaged in buying any commodity, whereby they, or either of them, was to refrain from buying such commodity from any one having same for sale."

If we grant this to be the intent of the statute, yet in the instant case there was no such agreement. On the contrary, appellant was buying beer from two other parties at the time, and was selling same commodity to the saloon men of Orange.

In the case of Wood v. Ice & Cold Storage Co., 171 S. W. 497, it was said by the court, after giving the definition of the law in the statute:

"Such being the literal language of the statute, the contract in question, in our opinion, comes precisely within the statutory definition of the acts denounced thereby, since the declared purpose of the contract is to prevent appellant from buying ice from any other person, firm," etc.

In the instant case, neither party to the contract agreed that appellant would not buy beer from any one else; in fact, as stated heretofore, the appellant was buying and continued to buy beer from two other manufacturers.

The court, continuing in the case last cited, says:

"By the statute it is unlawful for two persons to agree that one of them will buy from the other *exclusively of a given commodity* as it is in like manner unlawful for one of them to agree to sell exclusively to the other a given commodity."

No such state of facts exists in the instant case. A multitude of persons and corporations are engaged in the manufacture of beer, the same being a commodity.

In the two cases last cited, the grain and ice cases, the agreement affected both commodities and the parties to the contract, the purchaser and seller. In the present case, the commodity was not affected, and was being sold under various other brands by appellant and others to the saloon men of Orange, both before and after the making of the contract.

The case of Nickels v. Prewitt Auto Company, supra, is very similar to the instant case. The fact is that the stipulation in the contract in that case is almost identical with the one now before us. Upon that stipulation was based the proposition that the contract was in conflict with the anti-trust statute, and therefore not enforceable. As the court said in that case, it did not prohibit the Prewitt Auto Company from making sales elsewhere; neither in the case before us did the contract prohibit the American Brewing Association from making sales of its beer elsewhere. In the Prewitt Case there was no attempt to fix prices or prohibit appellant from purchasing or selling other articles of the same kind obtained elsewhere, and in the instant case the contract did not attempt to fix prices or prohibit the appellant, Woods, from purchasing or selling the commodity of other breweries obtained elsewhere. In fact, appellant was, at that very time, handling beer for the Magnolia Brewery of Houston, and from Pilsener people.

It was held in the Prewitt Case, on motion for rehearing, that the stipulation in question attempted to confer upon the appellant the sole right to sell the Moon Motoring Car Company's automobiles and supplies in the territory mentioned, and that the effect of it was to prohibit the Prewitt Auto Company, the other party to the contract, from making any sales of such property in that territory within the time prescribed.

In this case Woods, the appellant, according to the undisputed testimony, was not engaged in selling beer to the consumer or at retail, but his business was exclusively with the saloon men, and the terms of the contract were substantially that appellant would pay appellee the $2,400 debt owing to it by Mr. Boland, and that appellant would give to appellee the exclusive right to sell beer manufactured by it in Orange, Tex. The business was conducted between the parties by appellant ordering of appellee such beer as he desired. This beer was consigned to

appellant to be paid for when received. When received, it was stored in cold storage, which was paid for by appellee, until in the course of sales made thereof by appellant to the various persons, his customers, engaged in the sale of beer in Orange at retail, the shipment was exhausted. Appellant paid for the beer at $7, and sold it for $9 per barrel; the difference being his profit out of the business.

We do not believe that a contract such as the present is in violation of the state anti-trust law. The statutes with reference to trusts are aimed primarily at a protection of the public welfare. We do not believe that such a business arrangement as obtained in this case is inhibited by said statute. Only one of the parties in the present case is a corporation. That party is the manufacturer. It sends its manufactured product to the city of Orange, bill of lading attached, to a party then engaged in selling other articles of like character, manufactured by other persons or corporations, to the saloon men in the city of Orange. There is no price fixed or agreed upon at which the said manufactured article is to be sold to the saloon men of the city of Orange. The only price fixed is the price agreed upon by the parties to be paid by the appellant upon the delivery of the consignment of beer. The facts show that appellee has been making the same contracts, that is with reference to having one person handle its article in the city of Orange, 10 or 12 years prior to the making of this contract.

We have examined carefully all the authorities presented by appellee, some of which seem to be somewhat similar to the case in hand. We are persuaded to believe that it was not the intention of the Legislature to prohibit the making of such a contract as is shown to have been made in this case, and that the said contract is not in violation of the state anti-trust law, or any section of same. In other words, we can see no fact in this case which would indicate a conspiracy in restraint of trade, but it appears, to our minds, simply a method by which the manufacturer of an article supplies said article to the trade, and is not an effort, in our judgment, to stifle competition.

[2] Appellee contends that inasmuch as the contract was not to be performed within a year, and the same being oral, that it was contrary to the statute of frauds. We do not believe that the contention is sound. Railway Co. v. Wood, 88 Tex. 191, 30 S. W. 859, 28 L. R. A. 526; Warner v. Railway Co., 164 U. S. 418, 17 Sup. Ct. 147, 41 L. Ed. 495.

It follows from what has been said that in our opinion the lower court was in error in instructing a verdict for appellee, and we so hold.

The cause is therefore reversed and remanded for a new trial.